UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v.  )  Criminal No.: 08-10352-NG<br>)<br>SRIDHAR REDDY, )<br>SUDHA RANI aka SUDHA SANIVARAPU, )<br>VENKAT NAIDU, and )<br>RICHARD SCHWARTZ )<br>)<br>Defendants. ) | |

## SENTENCING MEMORANDUM OF DEFENDANT RICHARD SCHWARTZ

### I. INTRODUCTION

On April 19, 2010, Richard Schwartz signed a Plea Agreement in which he agreed to plead guilty to the only count on which he was charged in this case: Count One, conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371.  Under the terms of that agreement, ¶ 4, the government will recommend a sentence of 12 months incarceration or the low end of the guideline range as calculated by the Court, whichever is higher.  The recommendation will also include a fine of $7,000, unless the Court finds Mr. Schwartz is not able financially to pay that amount, and 24 months of supervised release (and mandatory special assessment).  Id.

This Memorandum is filed in support of Mr. Schwartz's recommendation that instead he be sentenced to a term of probation, with conditions that the Court deems appropriate in light of his personal circumstances.  We will turn first to the two disputed issues under the Advisory

Guidelines, and then to the reasons supporting Mr. Schwartz's recommendation for probation rather than jail.

## II. DISPUTED GUIDELINE ISSUES

### A. Abuse of Trust (3B1.3)

The first disputed guideline issue arises from the government's objection to Probation's failing to include in its guideline calculations in the Presentence Report ("PSR") a 2 point addition for abuse of trust under USSG § 3B1.3. The government's efforts to include these 2 points is not without irony. As the Probation Officer noted, the investigation of this matter by Mr. Schwartz's then-employer, the Department of Workforce Development, determined that Mr. Schwartz's letters which are the subject of the indictment inflated his position and role within the agency: he did not hold the title of "IT Project Leader;" he was not a member of management; and he was not a supervisor. Addendum to PSR, p. 29. Accordingly, "the defendant's actions which led to his prosecution in this case exceeded the authority of his position…" Id.

Thus, although the defendant may have represented in the letters that he held a position at a high enough level to be "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)," USSG § 3B1.3, Application Note 1, his own agency has refuted those representations. Mr. Schwartz's overblown representations concerning his position cannot substitute for the requirement that he actually occupy such position.

The Addendum to the PSR correctly points to two other provisions of the abuse of trust Application Notes as being potentially applicable even if Mr. Schwartz did not actually occupy a position of trust. Addendum to PSR, p. 29. And also correctly, it concludes that neither triggers addition of the 2 points. Id.

The Application Notes specify one type of situation only in which the abuse of trust guideline applies to a defendant "who exceeds or abuses the authority of his or her position," and that is only if the defendant does so "to obtain, transfer, or issue unlawfully, or use without authority," any "means of identification," as defined in 18 U.S.C. § 1028(d)(7).  Application Note 2(B).  The examples given in the Application Note, and the fact that the definition of "means of identification" is imported from the statute proscribing identity fraud, demonstrate that this provision is designed to apply to cases which involve identity fraud.  The cases interpreting the provision have so held.  See, e.g., U.S. v. Abdelshafi, 592 F. 3d 602, 611 (4th Cir. 2010) (provision applies to unauthorized use of patients' identifying information to file fraudulent Medicaid claims).

The present case stands on the opposite end of the spectrum from identity fraud cases, however, in that all the names and identifying information of the prospective foreign employees was accurate.  The gist of the scheme charged here was not to steal peoples' identities, or to get H-1B visas for phony people, or by using stolen identity data.  Rather, it was trying to get real people H-1B visas using their own identifying data.  The falsity was allegedly in the representations about the availability of the employment, Indictment, ¶s 13, 15, 16, 17, not that the visas were to be obtained through false, stolen, or misused identity data.

Any reliance on Application Note 3 to secure the 2 point addition is equally unavailing.  It applies where "the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of public or private trust when, in fact, the defendant does not." Id.  The examples given are to defendants who pose as an investment broker or a licensed physician, when they are not, in order to perpetrate a fraud.  Such impersonation triggers the abuse of position of trust provision by making victims or potential victims believe the defendant has

obtained, through the necessary education and training, a professional position that enables the defendant to advise, guide, and assist the victim. Here, Mr. Schwartz was no imposter. He actually worked for the agency on whose letterhead he signed the letters. While he embellished the extent of his authority in the job he actually held, he did not concoct for himself a phony professional license or position as part of the alleged scheme. Indeed, the indictment is silent on any allegation that Mr. Schwartz falsified anything about his authority or position, and limits the falsification to the availability of employment. Indictment, ¶s 13, 15, 16, 17.

### B.     More than 6 Documents (2L2.1(b)(2)

The guideline provision that applies to cases involving false statements about the immigration status of others, in violation of 18 U.S.C. § 1546, is USSG 2L2.1. Although Mr. Schwartz is charged only in the conspiracy count, Count One, the other 11 counts all charge other of the co-defendants with substantive violations of § 1546. The core of the conspiracy with which Mr. Schwartz is charged is that he signed the letters that misstated the availability of positions of employment in his agency for the named foreign nationals. Indictment, ¶s 15, 20, 21.

The specific offense characteristic attached to USSG 2L2.1 on which the government relies here is an increase of 3 points for the use of 6-24 "documents or passports." 2L2.1(b)(2)(A). It is undisputed that the indictment alleged, as overt acts in support of the conspiracy, that Mr. Schwartz signed 11 false letters that were submitted by his co-defendants in support of the H-1B visa applications of various foreign nationals. Indictment, ¶s 21-31. The question is whether those 11 letters are "documents" that fall within the guideline.

To answer that question, it is necessary to look at the core language of § 1546 that Mr. Schwartz was charged with conspiring to violate. The operative language for Mr. Schwartz's

charged conduct relates to anyone who "knowingly subscribes as true, any false statement with respect to a material fact <u>in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder</u>…" (emphasis added).  The letters that Mr. Schwartz signed are clearly not applications or affidavits at all, let alone ones required by the immigration laws.  Nor are they "other documents" required by the immigration laws or regulations.  To the best of counsel's knowledge, nowhere in that repository of law does there exist any requirement for letters of the types Mr. Schwartz signed.  This belief is reinforced by the government's recitation of the requirements for obtaining an H-1B Visa.  Indictment, ¶s 1- 7.  That recitation cites no fewer than six specific forms or documents that are required by those laws, and nowhere suggests that the employment letters that Mr. Schwartz signed were so required.

Rather, the indictment alleges that the  letters were submitted "in support of" the H-1B Visa applications.  <u>See</u>, <u>e.g.</u>, ¶s 13, 21-31.  It is this language on which the Probation Officer based her conclusion to reject Mr. Schwartz's objection to inclusion of these 3 points, PSR Addendum, pp. 31-32, and on which the government apparently relies in advocating for this increase.  <u>See</u> Plea Agreement, ¶ 3.   However, there is no language in the guideline, or in the immigration laws or regulations, that transforms a document filed "in support of" a required document into a required document itself.  If the Sentencing Commission had intended a more elastic version of the documents covered by the guideline, then it would have expressly included it.

The fact of the matter is that the so-called letters of employment are not documents required by the immigration laws or regulations.  They do not fit within the definition.  And they should not trigger a 3 point increase in Offense Level.

### III. **GUIDELINE CALCULATIONS**

Based on the arguments advanced above, Mr. Schwartz respectfully urges the Court to calculate the advisory guidelines as follows:

    11  -  Base offense level (2L2.1(a))

            Less

     2  -  Acceptance of responsibility (3E1.1(a))

    _____

     9  -  TOTAL (Zone B, 4-10 months)

### IV. **MR. SCHWARTZ SHOULD BE GIVEN A SENTENCE OF PROBATION WITH APPROPRIATE CONDITIONS RATHER THAN INCARCERATION**

We urge on behalf of Mr. Schwartz that the Court sentence him to a term of probation, with such conditions as the court deems appropriate. Based on the plea agreement, ¶ 4(a), we understand the government to be seeking a sentence of 12 months incarceration (unless the low end of the guideline range calculated by the Court is higher).

The starting point for the analysis of probation versus incarceration is the oft-quoted Congressional mandate to the Sentencing Commission that it "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense…" 28 U.S.C. § 994(j). Mr. Schwartz has pled guilty to this offense and has accepted full responsibility for it. He understands that he should not engage in <u>any</u> conduct that would constitute <u>any</u> federal crime. But in the spectrum of cases that come before this Court, although his conduct was wrongful, it does not rise to the level of "an otherwise serious offense."

Although it is always perilous to purport to tell a Judge why she has imposed particular sentences on other defendants, nonetheless, from the public record, it appears that this reality has been reflected in the non-prison sentences given to the three co-defendants. Congress has required the Court to consider, as one of the sentencing factors, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). And thus the question is whether there is anything about Mr. Schwartz's personal history, offense conduct, and other relevant factors to warrant the Court's giving him a jail sentence when it has declined to do so for the other three defendants. What is there about Mr. Schwartz and his conduct, in other words, that would justify him being the only participant in this scheme to go to jail?

In answering this question, we are well aware of self-serving efforts by the other defendants to wag incriminating fingers in Mr. Schwartz's direction, and to suggest that Mr. Schwartz was somehow the mastermind and principal orchestrator of this scheme. But any effort to portray Mr. Schwartz in this light is belied by the way the allegations in this case have been framed and summarized by the government in Court.

The Assistant U.S. Attorney's description of what the evidence at trial would show, presented at Mr. Naidu's Rule 11 change-of-plea hearing on March 19, 2009, demonstrates the relatively subordinate position of Mr. Schwartz within the hierarchy of this scheme. As background, Mr. Cohen noted that Naidu was familiar with the process of bringing nonimmigrant workers from India to this country on temporary work visas. 3/19/09 Transcript, p. 6. Co-defendants Reddy and Rani operated a similar business in which they brought Indian nationals here on temporary work visas. Id. Between May, 2007 and February, 2008, Naidu and Reddy entered into an agreement to help procure for Reddy fake employment letters from the

Commonwealth of Massachusetts to help some nonimmigrant workers from India obtain temporary work visas so they could work in the United States for Reddy's and Ranny's companies. Id. at 6-7. As further described by Mr. Cohen, id. at 9:

> So in order to achieve the aims of the conspiracy, Mr. Naidu drafted a standard letter for Mr. Reddy to use. Mr. Reddy then inserted the names of approximately 14 individuals who were nonimmigrant workers in India who were unable to provide employment letters to the consulate, and, therefore, were unable to get H1B Visas, but Mr. Reddy wanted to bring them to the United States, so he needed letters.
>
> Mr. Naidu drafted letters, Mr. Reddy inserted the names….

It is important to note that as Mr. Cohen describes the unfolding of the scheme, up to this point it has been conceived and orchestrated by Reddy and Naidu for their mutual business benefit, as businessmen who were knowledgeable in procuring for their U.S. businesses nonimmigrant Indian workers, and who were financially motivated in their business interests to do so. Only at this point does Mr. Schwartz first enter the scene, as Naidu then approaches him with the letters that Naidu drafted,[1] **a**nd Schwartz puts them on Commonwealth of Massachusetts letterhead, signs them, and gives them to Reddy. Id. The indictment charges that 11 of these 14 letters were ultimately submitted to consulates in India in support of applications for H1B Visas. Id. at 9-10. The indictment alleges that Reddy and Rani supplied the employment letters that Schwartz had signed to the visa candidates in India for the sole purpose of submitting them to the U.S. Consular Office in India to defraud the Consular Officer. Indictment, ¶ 16.

So from the government's description of the evidence, both in court and in the indictment itself, it is clear that Mr. Schwartz's role, though concededly a vital one in the success of the scheme, was relatively limited. Naidu and Reddy conceived the scheme. They drafted the letter

---

[1] The indictment, ¶ 20, alleges that Naidu and Reddy drafted the letters.

and got it to Schwartz.  And after Schwartz had the poor judgment to use his offices to print the letters on Commonwealth letterhead, sign them,  and provide them to Reddy, Reddy and Naidu them took them and ran with them to implement the plan to get them into the hands of the Indian workers  to submit to Consular Officers in India.  The ultimate objective was to serve the business interests of the three other defendants who utilized Indian nonimmigrant workers (presumably at substantially reduced costs from U.S. workers) in their U.S.-based businesses.

Although Naidu and Reddy cooperated with the government, it does not appear from the sentencing transcripts that their cooperation was a critical factor in the probationary sentences.  Naidu was the first to change his plea and to cooperate, and claimed credit for his cooperation changing the pleas of the other three defendants.  Naidu Sentencing Memorandum, pp. 1, 6.  Yet although the Court accepted the government's motion for a downward departure under USSG 5K, the principal reason the Court articulated for accepting the government's recommendation of two years probation was that "jail isn't necessary for the purpose of accomplishing any of the purposes of sentencing here…"  Naidu Sentencing Transcript, 1/19/11, p. 2.  The Court proceeded to state that "even in terms of general deterrence, we've forgotten about how stressful and difficult felony prosecution is, and the fact that it's a substantial deterrence…and I believe that Mr. Naidu will not be here with us again."  Id.  A probationary sentence "enables the probation officer to…monitor you to make certain that there isn't a repeat offense…so it seems to me this is an appropriate deterrence, appropriate monitoring to make sure that you stay within the lines."  Id., at pp. 2-3.

With Reddy, unlike Naidu, the government was seeking a jail sentence (nine months).  Reddy/Rani Sentencing Transcript, 1/20/11, p. 8.  Everyone agreed that Reddy was more culpable than his wife, Rani (who was inexplicably charged with nine substantive counts).  Id. at

9

3. But while the Court referenced Reddy's cooperation, and the government's requested downward departure, it seemed to peg Reddy's sentence more on the same type of core 3553 analysis as with Naidu: "It is also clear to me that the recommendation of any incarceration here would be a formal recommendation just to show that we are being serious about this offense and not necessary in this case, not the sentence that would be necessary and sufficient in this case." Id. at pp. 3-4. The Court then emphasized the severe disruption on the family of Rani being deported to India with their children, and her husband Reddy staying behind here. Id. at p. 4. While noting that Reddy had "cooperated well," the Court stated: "I'm not going to accept the government's recommendation of imprisonment, as I said, it makes no sense to me in terms of the purposes of punishment. Again, the government agrees that it wasn't necessary to keep you from doing this again, to specifically deter you." Id. at p. 9. the Court believed that the cause of general deterrence was served by Reddy's time served (7 days in jail), probation, and deportation. Id. Thus, he was sentenced to time served and supervised release of three years.

Rani, who did not cooperate, had an offense level computation of 12 (10-16 months). Id. at p. 2. But, the Court said, "everyone seems to agree that the better sentence, the more appropriate sentence is probation than any kind of time whatsoever for Ms. Rani, and I appreciate what the government says about the seriousness of the offense." Id. Speaking more generally, the Court observed:

> What we have lost sight of, and hopefully we can begin to look at again is that felony conviction and probation is not nothing…[T]here are many ways of punishing people, and throwing them in jail is only one way.
>
> Punishment can come in all sorts of forms, including the conditions of release, including probation, including forfeiture, including fines, including deportation…

Id.

Rani was sentenced to three years probation.  Id. at p. 3.

Turning to Mr. Schwartz, we are well aware that the analysis has to be tailored to each individual.  We are aware as well that there were certain differences between the other three defendants and Mr. Schwartz, in terms particularly of cooperation with the government (by Naidu and Reddy), and their being subject to deportation.

Nonetheless, we believe from the public record that for sentencing purposes, Mr. Schwartz occupies much common ground with his co-defendants, and that the principal reasons animating their probationary sentences extend to him as well.  These factors greatly outweigh the distinctions of cooperation and deportation in making this a distinctively non-jail case for Mr. Schwartz as well; a case in which probation (combined with appropriate conditions and any monetary terms) will be "sufficient, but not greater than necessary," to comport with the 3553(a) statutory purposes.  In terms of the seriousness of the offense and the need to provide just punishment for it, 3553(a)(2)(A), these factors should, if anything, weigh more favorably for Schwartz than for Naidu and Reddy based on his relatively lower degree of culpability for the overall scheme as compared to them, as discussed above.  At worst, it is a draw.  As a result, the general deterrence considerations of a probationary sentence should also not weigh more heavily for Schwartz than for the other defendants.

In terms of deterring Mr. Schwartz himself from committing further crimes, he is as unlikely a federal defendant as any to enter these halls and answer charges.  There is nothing about his background, history, or career path that would hint at his ending up where he is today.  Nor is there with him – any more than with his co-defendants – any hint that a probationary sentence won't itself be harsh enough, and provide sufficient monitoring and oversight, to deter him from committing future crimes.  The fact of the matter is that this entire criminal proceeding

has already taken a huge toll on Mr. Schwartz and his family.  Mr. Schwartz stands before the Court as a broken man who sees himself having a bleak future, and whose family ties are badly frayed.  The disruption that these events have already caused within his family is enormous.  And whatever conditions of probation the Court may deem appropriate may present further burdens for this individual and his family.  With a sentence of probation, Mr. Schwartz is no more likely than any of his co-defendants to reappear in this or another Court to answer criminal charges.

RICHARD SCHWARTZ,
By his attorneys,


 /s/  Bruce A. Singal
Bruce A. Singal (BBO #464420)
Michelle R. Peirce (BBO#557316)
Donoghue, Barrett & Singal, P.C.
One Beacon Street, Suite 1320
Boston, MA 02108
(617) 720-5090
bsingal@dbslawfirm.com

Dated:   April 22, 2011


CERTIFICATE OF SERVICE

I, Bruce A. Singal, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 22nd day of April, 2011.


 /s/  Bruce A. Singal
Bruce A. Singal